[No. 29393. *En Banc.* January 31, 1945.]

Erle C. Best, *Respondent,* v. A. F. Kelley *et al.,*
*Appellants.*[1]

[1]Reported in 155 P. (2d) 794.

*Padden & Moriarty, Weter, Roberts & Shefelman,* and *James Gay,* for appellants.

*Rummens & Griffin,* for respondent.

BEALS, C. J.—Defendants, A. F. and L. Pearl Kelley, husband and wife, during the year 1943 were the owners of a lease from Harry W. Crosby, covering the St. Regis hotel property in the city of Seattle. Defendants owned the furniture in the hotel and had been operating the business for some time. The St. Regis is a seven-story hotel, advantageously located, and well patronized.

Plaintiff, Erle C. Best, was a licensed real estate and business chance broker, and was acquainted with defendants.

April 21, 1943, plaintiff suggested to defendant A. F. Kelley that the latter give him a listing of the hotel property. A rather brief typed listing form was accordingly partially filled out, and on the same paper was typed the following, which Mr. Kelley signed:

"Mr. Erle C. Best, Seattle, Washington
"409 Lloyd Bldg., April 21, 1943
"Seattle, Washington.
"Dear Sir:
"I hereby authorize you to sell my above described business for $45,000.00 as follows $20,000.00 down payment and the balance at the rate of $1,000.00 a month, plus interest on the unpaid balance at the rate of six per cent per annum and agree to pay you a ten per cent commission for your efforts in negotiating the deal.
 "Yours very truly,
 "A. F. KELLEY"

After delivery of the foregoing, Mr. Best contacted Messrs. C. R. and J. R. Shipley, who agreed to purchase the lease and furniture at the price specified in the listing. April 23rd, the purchasers signed an earnest money receipt prepared by plaintiff, tendering therewith a check for

one thousand dollars as earnest money. Plaintiff presented the document and check to defendant A. F. Kelley for his approval, whereupon defendant refused to sign it, saying that by the terms of his lease he could not assign the same without the consent of the lessor, and that Mr. Crosby had refused to consent to the sale to the Messrs. Shipley.

The sale was never completed, and plaintiff instituted this action against defendants for the recovery of forty-five hundred dollars by way of a commission which he alleged he had earned pursuant to the agreement above quoted.

The action was tried to the court sitting without a jury, and resulted in a judgment in plaintiff's favor, from which defendants have appealed.

Error is assigned upon the court's ruling that respondent had proved by the preponderance of the evidence that he had produced purchasers who were ready, able, and willing to purchase the hotel business upon the terms offered by appellants, in that, (1) the proposed purchasers offered to buy the property on terms and conditions different from those prescribed by appellants, which terms were never accepted, approved or ratified by appellants; and (2) because the failure to consummate the purchase was due to the existence of a defect in the title of appellants (the lessor's refusal to consent to the assignment of the lease), of which defect respondent had actual or constructive notice.

Appellant A. F. Kelley (who will be herein referred to as though he were sole appellant) signed nothing in connection with the deal save the authorization hereinabove set forth following the "listing," which consisted merely of a rather brief and incomplete description of the lease, the property covered thereby, the estimated income, and a reservation of title to some furniture and tools. The authorization makes no reference to certain details in connection with the contemplated sale which concern matters that, particularly in view of the value of the property, might well be deemed essential to a completed transaction.

The earnest money receipt prepared by respondent, signed by the Messrs. Shipley, and submitted to appellant, indicates that respondent realized that certain important matters connected with the transaction were not referred to in the authorization. After describing the property, the price to be paid as stated in the authorization, reservation of title to certain property in appellant, the document provides that the deferred payments shall "be secured by the furniture and equipment now in the building on said property." The earnest money receipt also contains the following paragraph:

"The purchaser shall be given possession of said property within ten days, and then given a bill of sale showing good and sufficient title to said property and lawful right to convey the same, and shall be furnished an affidavit under the Sales in Bulk Law at purchaser's option. Whereupon the purchaser agrees to complete the purchase in the manner and upon the terms herein, and in case of his failure so to do the said sum herein receipted for shall, at the option of the seller, be forfeited as liquidated damages. If the title is not good and cannot be made good within ............ days after receipt of notice of any defects this agreement is void and the earnest money shall be refunded."

In many particulars the testimony is in sharp conflict. After certain formal findings of undisputed facts, the court made finding V, which reads as follows:

"That within said ten day period, and on the 23rd day of April, 1943, plaintiff, pursuant said listing, obtained a purchaser ready, able and willing to buy said property from defendants for the agreed consideration of $45,000.00 *upon the precise terms and conditions specified in said listing,* and defendants have failed, refused and neglected to consummate said deal. *That plaintiff fully performed his obligations under said listing contract.* That defendants did breach said contract and are indebted to plaintiff in the sum of Four Thousand Five Hundred and 00/100 ($4,500.00) Dollars." (Italics ours.)

The court entered its conclusion of law in respondent's favor, followed by the judgment appealed from.

The proposed earnest money receipt presented to appellant by respondent, purporting to embody the terms of the

contemplated sale, provided that the deferred payments should "be secured by the furniture and equipment now in said property." The manner of securing the deferred payments was not touched upon by the authorization upon which respondent relies. Respondent, then, recognized that something further was necessary to a completion of the deal, but made no provision in the earnest money receipt that the deferred payments be secured by the most valuable portion of the property, namely, the lease. It would seem that the furniture, if separated from the lease, could not be adequate security for the balance due. It is not to be imagined that appellant intended to leave twenty-five thousand dollars in deferred payments absolutely unsecured. Respondent evidently realized this, but in preparing the earnest money receipt provided only for what any reasonable vendor or broker would say was inadequate security.

The earnest money receipt also provided for turning over possession of the property to the purchasers within ten days, a matter concerning which the authorization was silent.

 The general rule applicable to such a situation as is above stated is found in 8 Am. Jur., title "Brokers," p. 1092, § 176:

"Where a broker instead of procuring a person who is ready, able and willing to accept the terms his principal authorized him to offer at the time of his employment, procures one who makes a counter offer more or less at variance with that of his employer, the latter is at liberty either to accept the proposed party upon the altered terms or to decline to do so. If he accepts he is legally obligated to compensate the broker for the services rendered, but if he refuses he incurs no liability therefor. . . . This is true even though there is but a slight variance between the contract tendered by the broker and that authorized by his employer."

This rule was followed by the court of civil appeals of Texas in the case of *Gough v. Coffin,* 55 Tex. Civ. App. 550, 120 S. W. 210. The facts are summarized by the court as follows:

"They [the brokers] were authorized to sell 2,424 acres of land at five dollars per acre, one-half cash, balance payable in one, two, three, four and five years. The entire purchase price amounts to $12,120. They relied upon the written contract made by them with the alleged purchaser, Shirley. This contract is dated February 23, 1906, and stipulates not that the sale shall be closed at once, but on or before April 1, 1906. It purports to bind Coffin, the principal, to convey the land to Shirley, and acknowledges the receipt by the agents of $1,000 cash; it stipulates that said sum shall not only be held and considered as a forfeit to said principal in the event Shirley shall fail to comply with his contract, but shall be considered as a part of the cash payment on the purchase of said land, 'and shall be held and binding on the said J. M. Coffin to make and execute his deeds of conveyance to said Shirley.' This was not a compliance with the terms authorized by the principal, Coffin."

In holding that the broker was not entitled to recover a commission, the court said:

"The law is well settled that the broker, in order to earn his commission, must find a purchaser not only ready, able and willing to buy his principal's property, but also upon the very terms authorized by the principal. . . . The agent or broker, authorized to sell, must keep within the restricted authority conferred upon him, and strictly pursue the method prescribed by his instructions."

In the case of *Neely v. Lewis,* 38 Wash. 20, 80 Pac. 175, it appeared that the defendant had listed his stock of merchandise with the plaintiffs' agents for sale, intimating that he would consider an offer to trade the merchandise for farm lands. A third party listed with plaintiffs farm lands which he wished to dispose of. Plaintiffs suggested to defendant an exchange, and a tentative agreement was entered into between defendant and the owner of the farms, providing for the exchange of their properties and the payment of a cash balance to defendant,

" 'Seven thousand dollars ($7,000) the price due on the farm as first payment, four thousand dollars ($4,000) on or before the first day of June, 1903, and the balance, if any, to be arranged in a satisfactory manner to both parties.' "

Defendant agreed to pay plaintiff a commission in the sum of two hundred fifty dollars on consummation of the deal. The exchange agreement was never executed by the parties, who failed to agree on certain details. Plaintiffs sued Lewis, seeking to recover the agreed commission. The superior court rendered judgment in favor of the plaintiffs, and on defendant's appeal to this court the judgment was reversed. In the course of the opinion, the court said:

"To entitle the respondents to recover their commission, they were obligated to show that they had procured a purchaser ready, able, and willing to take the property on the terms upon which they were authorized to make the sale, or on terms satisfactory to the owner of the property. . . . It is plain that the minds of the parties did not meet on the question of the terms of the sale, and as a consequence either party could refuse to close it without incurring a liability to the other."

In the case at bar, the matter of securing the deferred payments was not referred to in the authorization and was obviously left for later consideration. That a listing of property with the broker is generally not a complete offer of sale embodying all the terms to be insisted on by the vendor, was noted by this court in the case of *Carstens v. McReavy*, 1 Wash. 359, 25 Pac. 471, where this court said:

"Scarcely any man, when listing his property with a real estate agent, stops to give details either as to the property itself or as to the arrangements he desires to make, yet no one would sell upon equal terms to a first class business man and to an habitual drunkard, or well known insolvent; and the ordinary owner would not sell at all to a person whose very occupancy would tinge the neighborhood with a bad repute."

It is even more unlikely that appellant, an experienced businessman, would sell a valuable hotel property by a contract calling for deferred payments in excess of fifty per cent of the value of the property, without receiving adequate security for the payments. Certainly, one in appellant's position is not obligated to accept any arrangement for securing the deferred payments which a purchaser under such a listing as is above quoted may elect to offer.

Respondent cites the case of *Bloom v. Christensen*, 18 Wn. (2d) 137, 138 P. (2d) 655, in which the rule is correctly stated as follows:

"It is the general rule that a broker is entitled to his commission when he produces a purchaser who is ready, able, and willing to purchase upon the terms required. . . . "The rule applies even though the sale is not consummated by the owner or is consummated by him upon terms different from those stipulated in the brokerage agreement."

In the case at bar, the terms set forth in the earnest money receipt varied from the written listing, and it is admitted that no sale between appellant and the Shipleys was ever consummated. In the case cited, it appeared that the defendant ultimately sold to the vendee procured by the agent the property covered by the listing, although upon terms different from those which the agent was authorized to offer. The case is not here in point, as the authorization signed by appellant left important matters to be adjusted by further negotiation. The proposed earnest money receipt was in the nature of a counter offer. Appellant was at liberty to reject its terms without incurring liability to respondent. The property was not sold to any purchaser procured by respondent, or at all.

Respondent contends that appellant did not seasonably urge the matters above discussed, and that since appellant, when he refused to sign the earnest money receipt, said merely that the owner of the hotel would not consent to an assignment of the lease to the Shipleys, appellant is now precluded from urging the points above discussed. In support of his contention, respondent cites several authorities, including *Donley v. Porter*, 119 Iowa 542, 93 N. W. 574. The case cited appears to lend some support to respondent's argument, because of the general language employed in the opinion. It appears, however, from the opinion that the objections to the proposed contract interposed by the defendant when the contract was tendered to him were without substantial foundation in law. Every other objection which the defendant raised on the trial, at least some of which presented questions entitled to serious

consideration, was presented for the first time after the commencement of the litigation. The Iowa court held that the objections were not available, as raised too late.

This court considered the question of the timeliness of the presentation of objections to a proposed contract, in the case of *Broderick v. Baker*, 151 Wash. 1, 274 Pac. 722, holding that the good faith of the party raising the objection was an element to be considered. In the *Broderick* case, it appeared that the defendant at first objected to a proffered contract of sale on the ground that the offer was made too late, while on the trial of the action which was brought for the purpose of recovering a broker's commission, the defendant presented the additional contention that the proposed contract submitted to him varied from the contract which the agent had been authorized to procure. Concerning the plaintiff's contention that the objection last mentioned was raised too late, this court said:

"The objection that the offer comes too late is, if well taken, a complete defense to any claim which the person offering the agreement may seek to establish against the other party to the transaction, and this claim, if made in good faith, (and we find no reason for doubting appellant's good faith in stating to Mr. Duryee that the offer came too late) was a sufficient statement of appellant's position to justify appellant's refusal to at that time proceed further with the proposition, and to excuse appellant from an immediate and careful perusal of the instrument offered and the statement of further objections thereto, paragraph by paragraph, granting that such an obligation would under any circumstances have rested upon appellant."

In the case at bar, the fact that the landlord refused his consent to the assignment of the lease was sufficient to render vain further negotiations in connection with the proposed sale to the Shipleys. After ascertaining that this definite block to the completion of the deal existed, appellant was not required to make an immediate and detailed study of the terms of the proposed earnest money receipt; and appellant, at a subsequent time, was entitled to urge the contention that the earnest money receipt was objectionable as proposing terms to which he had never

agreed, and would not agree. It nowhere appears that appellant was guilty of bad faith in not suggesting this matter when the earnest money receipt was presented for his consideration, and under the rule laid down in the *Broderick* case, *supra*, with which we are in accord, appellant was entitled to raise the objection at the time he urged it.

· The presentation of the proposed earnest money receipt to appellant amounted to no more than an offer on behalf of the Shipleys, to which appellant was entitled to present any reasonable objections; and respondent had no sufficient ground for claiming payment of a commission upon the facts shown.

We shall also consider the question of whether or not respondent earned his commission by finding purchasers to whom appellant's lease could not be assigned because of the fact that the lessor refused to assent to the assignment to such purchasers.

The listing refers to appellant's lease, so there can be no question but that respondent was advised that appellant was offering for sale a leasehold interest.

The lease contains the following paragraph:

"This lease or any part hereof shall not be assigned by lessee, or by operation of law, or otherwise, nor said premises sublet without the written consent of the lessor endorsed hereon; and in the event such written consent shall be given, no other or subsequent assignment, assignments or subletting, shall be made by such assignee or assignees or sublessee without previous consent of lessor first had and obtained in writing."

Such a clause in a lease has been considered by this court as a defect in the lessee's title. *Merritt v. Lillyblade*, 57 Wash. 159, 106 Pac. 621; *Brownell v. Hanson*, 109 Wash. 447, 186 Pac. 873.

It is not disputed that, when the earnest money receipt was presented to appellant by respondent, the former refused to sign it because of the fact that the lessor had refused to consent to the assignment of the lease to the Shipleys. The lessor testified on the trial, stating that he

was not willing to comply with appellant's request that he consent to the assignment of the lease to the persons named.

In 8 Am. Jur., title "Brokers," p. 1098, § 185, the general rule is stated as follows:

"The great weight of authority is to the effect that in the absence of a stipulation in the contract between the broker and his principal to the contrary, the former is entitled to his commissions if, acting in good faith, he procures a purchaser willing, able, and ready to take the property upon the terms offered by the principal, although the contract is rescinded or the sale otherwise fails because of a defect in the principal's title, of which the broker had no notice. . . .

"If a broker, at the time he makes his contract with the owner, knows of defects in the employer's title, or knows of facts sufficient to put a prudent person on inquiry, which, if followed with reasonable diligence, would have resulted in such knowledge, he is not entitled to recover where the sale fails because of such facts, unless it was the intention of the parties that the employer should subsequently perfect his title in order to be able to perform."

In the case of *Renick v. Mann,* 194 Ky. 251, 238 S. W. 763, the court of appeals of Kentucky stated the rule as follows:

"The general rule is that a broker is entitled to his commission, who, acting in good faith, procures a purchaser willing, able and ready to take the property upon the terms offered by the principal, and this is true notwithstanding the sale fails because of a defect in the principal's title of which the broker had no notice. But if the broker at the time he makes the contract with the owner knows of the defect in his employer's title or knows facts sufficient to put a reasonably prudent person on inquiry, which if followed with reasonable diligence would bring to him such knowledge, he is not entitled to recover where the sale fails because of such defect, unless it was the intention of the parties that the employer should subsequently perfect his title in order to perform the contract of sale."

The cases of *Gettleson v. Lewis,* 206 Mich. 113, 172 N. W. 387, *Boggs v. Lumbar,* 75 Colo. 212, 225 Pac. 266, and *Foltz v. Conrad Realty Co.,* 131 Va. 496, 109 S. E. 463, are to the same effect.

In the case of *Brownell v. Hanson, supra,* this court said:

"If the broker knew of the defects in his principal's title and entered into the contract of brokerage he could not recover, of course, unless he met the conditions or the conditions were removed. . . . In other words, he takes the contract to procure a purchaser who is ready, willing and able to buy what the broker's principal has to sell, and if the broker knows that the principal has a title which the purchaser will not accept, then he has not produced a purchaser in accordance with the terms of his agreement."

We approve the rule adopted by the supreme court of Kentucky in the case of *Renick v. Mann, supra* (with the exception noted by that court), to the effect that if a broker, at the time he accepts a listing from the owner, knows of any defect in the owner's title, or is aware of facts sufficient to put a reasonably prudent person on inquiry, which if followed with reasonable diligence would advise him of any such defect, the broker is not entitled to recover a commission if the sale fails because of such defect.

■ Upon the question of whether or not respondent had actual notice of the fact that appellant could not assign his lease without his lessor's consent, the evidence is in direct conflict. Appellant introduced evidence tending to prove that respondent read the lease at the time of the listing. Appellant's testimony is corroborated by other disinterested testimony. On the other hand, respondent denied that he saw the lease before he obtained the Shipleys as prospective purchasers, and also denied that the matter of the necessity of obtaining the lessor's consent was mentioned by appellant at the time of the execution of the listing. Upon this issue, the trial court made a finding of fact in respondent's favor.

It is well-nigh inconceivable that a man of respondent's experience, both as a court reporter and as a real estate and business chance broker, would not be advised of the fact that a ten-year lease of a seven-story hotel building in the city of Seattle, in a very good locality, calling for a rental of seven hundred dollars a month for the first five years, and seven hundred fifty dollars a month for the last five years, would almost certainly contain a provision for-

bidding the assignment of the lease without the lessor's consent. The lease is in evidence, and was prepared on a printed form issued by a well-known Seattle printing firm, the restrictive clause referred to being a portion of the printed lease.

It is also significant that the earnest money receipt which respondent prepared contains in the paragraph above quoted the following:

"If the title is not good and cannot be made good within ............ days after receipt of notice of any defects this agreement is void and the earnest money shall be refunded."

Appellant, of course, refused to execute this document for the reason, as he stated, that his lessor refused to consent to the assignment, the legal effect of which amounted to a failure of appellant's title.

The supreme judicial court of Maine, in the case of *Knapp v. Bailey*, 79 Me. 195, 9 Atl. 122, 1 Am. St. 295 (an action between grantor and grantee), said:

"The doctrine of actual notice implied by circumstances (actual notice in the second degree) necessarily involves the rule that a purchaser before buying should clear up the doubts which apparently hang upon the title, by making due inquiry and investigation. If a party has knowledge of such facts as would lead a fair and prudent man, using ordinary caution, to make further inquiries, and he avoids the inquiry, he is chargeable with notice of the facts which by ordinary diligence he would have ascertained. He has no right to shut his eyes against the light before him. He does a wrong not to heed the 'signs and signals' seen by him. It may be well concluded that he is avoiding notice of that which he in reality believes or knows. Actual notice of facts which, to the mind of a prudent man, indicate notice—is proof of notice."

In the case of *Perkins v. Camozze*, 246 S. W. (Tex. Civ. App.) 735, the court of civil appeals of Texas said:

"The general rule invoked by appellees, that when a broker has done all that he is bound to do under the contract, i. e. secured a purchaser who is ready, willing, and able to buy, he is entitled to his commissions, and his right thereto does not depend upon the validity or invalidity of the principal's title, does not apply when the broker has

notice of the possible defective title, for it then becomes his duty to submit same to an intended buyer to ascertain whether he would take such title. 43 L. R. A. 600; *Foltz v. Conrad Realty Co.* (Va.) 109 S. E. 463."

In the case of *Ranger v. Lee,* 66 Misc. 144, 121 N. Y. Supp. 328, the court said:

"In the first place, there is no duty on the part of a real estate owner to inform a broker as to whether there are covenants as to nuisances in his chain of title, unless he is asked about it. It is the duty of the broker to ask, if he wants to know. A large part of the land in the borough of Manhattan is subject to such covenants in some form, covenants of ancient standing, of whose existence the owner is often unaware. It does not occur to the owner, unless he is an experienced trader, to inquire as to the existence of such covenants or to mention them if he knows about them. The employment of a broker is nearly always, as in this instance, at the broker's own suggestion. The broker is an expert in such matters, familiar with these covenants and their frequency."

In the case of *Wiggins v. Coddington,* 83 Misc. 439, 145 N. Y. Supp. 3, is found the following:

"The court charged in effect that mere silence as to the encroachments, on the part of the prospective seller, might be a misrepresentation and charged that the jury 'may infer wilful misrepresentation by silence.' In this the learned trial court erred. The broker is an expert in such matters and it is his duty to inquire as to terms of sale and as to matters affecting the general character of the property. There is no duty on the part of a real estate owner to inform a broker of encroachments unless he is asked about them. It is not misrepresentation, either wilful or inadvertent, for him to remain mute, when he is not asked, and when he is under no duty to volunteer or speak."

The cases of *Van Vliet & Place v. Gaines,* 221 App. Div. 538, 224 N. Y. Supp. 481, and *Avola v. Oppenheimer,* 153 N. Y. Supp. 421, are also in point.

In the case of *Sanford & Co. v. Waring,* 209 Ky. 489, 273 S. W. 43, the court of appeals of Kentucky held that the plaintiff broker was not entitled to recover a commission from the defendant, a sale which the broker procured having failed of consummation because of a defect in the de-

fendant's title to the property. It appeared that the defendant held title to the property under a deed conveying the land to him for life, and at his death to his heirs and assigns. The defendant had advised the broker that he had only a life interest in the property, but that his two heirs, a son and a daughter, were both of age and would sign the deed. The broker then accepted the listing and found a purchaser. Naturally the purchaser objected to the title, as no one could tell who the heirs of the defendant would be. In holding that the plaintiff could not recover, the court said:

"When Mr. Waring told Mr. Sanford that he had only a life interest in the property the broker had knowledge of such defect of title as would be sufficient to put a reasonably prudent person on inquiry. He was thus informed that Mr. Waring did not have title; neither of them was a lawyer; neither of them perhaps understood the legal effect of the deed under which Mr. Waring held. But when he knew that Mr. Waring had only a life estate it was as incumbent on him as on Mr. Waring to make inquiry as to the title. Mr. Waring did everything that he could to carry out the contract. The contract failed from a defect of title, of which Mr. Sanford had notice when the contract was made. The court, therefore, properly refused to give a peremptory instruction in favor of appellants."

In the case at bar, respondent knew that the property for which he accepted a listing was a ten-year lease covering an operated hotel. As we have stated, the provision against assignment without the lessor's consent is contained in most leases, and even more generally in leases of hotels and business properties. Assuming that respondent did not examine the lease, the burden of inquiring into the terms thereof rested upon him, and even a cursory examination of the lease would have disclosed the paragraph referred to.

It is not contended that appellant made any misrepresentation concerning the lease, or that any request by respondent to examine the lease was refused.

We have above called attention to the fact that the earnest money receipt which respondent prepared contained a

clause which would protect the purchaser in case of a defect in appellant's title.

Respondent cites authorities to the effect that, when a sale fails because of a defect in the vendor's title, of which the broker had no knowledge, the broker may recover his commission. Of these authorities, the case of *Gauthier v. West*, 45 Minn. 192, 47 N. W. 656, is a fair example. In this case, the supreme court of Minnesota, in holding that a broker could recover his commission, used the following language:

"Nor was it claimed by defendant, that plaintiffs had any knowledge of an infirmity of title when they agreed with defendant as to the amount of their commission in case of sale, or when they found and produced the customer; so that, conceding the contract to have been as defendant claims, the plaintiffs, having no knowledge of any defect in the title, were not obliged to wait for the amount due as their compensation until defendant's title was perfected."

The cases of *Roberts v. Kimmons*, 65 Miss. 332, 3 So. 736, and *Preston v. Postel*, 300 Fed. 134, are to the same effect.

The authorities cited by respondent are not controlling in the case at bar, as they are based on the proposition that the broker had no notice of any defect in the owner's title. The case at bar falls within the exception to the rule stated, for the reason that, assuming respondent did not have actual notice of the defect in appellant's title, he had such knowledge of the situation as to put him upon inquiry.

Respondent also relies strongly upon the case of *Norman v. Hopper*, 38 Wash. 415, 80 Pac. 551, where it appeared that two officers of a corporation listed the corporation's property for sale with the plaintiff, and subsequently the stockholders refused to ratify the sale to the customer secured by the broker. The broker procured purchasers who signed an agreement to purchase the corporation's property subject to ratification by all the stockholders, the purchasers assuming no liability for any failure to carry out the contract. The contract was never carried out, and the broker sued the president and secretary of the cor-

poration for his commission. The judgment of the superior court in favor of the broker was affirmed.

The case is not here in point. There was no defect in the title of the corporation. The defendants retained the services of the broker to find a purchaser for property which the defendants did not own and could not sell, any sale depending upon a vote of the stockholders, who could have conveyed good title to the corporate property had they desired to accept the terms offered. The defendants employed the broker to find a purchaser for the corporate property at a certain price, which service the broker performed, thereby, as the court held, earning his commission. The defendants could enter into such a contract with the broker if they desired to do so. In the case at bar, a defect in appellant's title prevented consummation of the sale of the property to the Shipleys. Since respondent was fully advised as to the nature of appellant's property, and was put on notice as to the almost certain restriction upon appellant's transfer of his lease, an entirely different situation is here presented.

Respondent also relies upon the case of *Dean v. Williams*, 56 Wash. 614, 106 Pac. 130, in which it appeared that the owner of the property and the purchaser found by the broker had entered into a binding agreement of sale and purchase. The deal later fell through because of a defect in the owner's title, of which the broker had no knowledge, nor had he knowledge of facts which would have put him upon inquiry.

For the reasons assigned, the trial court erred in awarding respondent judgment against appellants, and the judgment is accordingly reversed, with instructions to dismiss the action.

STEINERT, BLAKE, ROBINSON, and JEFFERS, JJ., concur.

MALLERY, J. (dissenting)—Since the decision of the court is based upon an overturning of the findings of fact by the trial court and inasmuch as I believe that the trial court is amply supported by the record in this case, I am impelled to dissent.

GRADY, J. (concurring in the result)—I concur in the result reached by Judge Beals and base my concurrence upon the fact that the lease contained the provision that it should not be assigned by the lessee without the written consent of the lessor, and, for this reason, the respondent was unable to carry out his contract with appellants. I think the situation was such that this respondent either knew or, by the exercise of reasonable diligence, should have known of the provision in the lease relative to assignment, and, therefore, cannot prevail in this action.

SIMPSON, J. (dissenting)—The judgment should be affirmed. The evidence depended upon by the majority is not sufficient to justify this court in overturning the judgment of the trial court, based as it was upon conflicting testimony.

In addition, I feel that the court should be governed by *Ollinger Co. v. Benton,* 156 Wash. 308, 286 Pac. 849; and *Bloom v. Christensen,* 18 Wn. (2d) 137, 138 P. (2d) 655.

MILLARD, J., concurs with SIMPSON, J.

---

April 10, 1945. Petition for rehearing denied.